Case 4:20-cr-00063   Document 23   Filed on 08/28/20 in TXSD   Page 1 of 14

United States District Court
Southern District of Texas
**ENTERED**
August 28, 2020
David J. Bradley, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>*Plaintiff*, | §<br>§<br>§ |
| VS. | § CRIMINAL ACTION NO. 4:20-CR-63 |
| TERRY REMON TURNER, JR.,<br>*Defendant*. | §<br>§<br>§<br>§ |

# ORDER

Pending before the Court is Defendant Terry Turner, Jr.'s ("Turner") Motion to Suppress an alleged faulty, suggestive, and unreliable eyewitness identification (Doc. No. 16). Turner filed a supplement to his motion (Doc. No. 17), the Government filed a response in opposition (Doc. No. 18), and Turner a reply (Doc. No. 19). Having considered the record in this case, the parties' briefs, and the applicable law, the Court denies Turner's Motion to Suppress.

### I.   **Factual Background**

The facts underlying this motion are basically uncontested, although to be clear Turner has not by any means admitted that he was involved in the robbery. On the morning of September 5, 2019, two men robbed a Cash America Pawn shop in Houston, Texas. (Doc. No. 18 at 2). The store's surveillance video showed the first suspect entering the premises wearing a hood pulled up around his face so that only his eyes and the bridge of his nose were visible. (Doc. No. 16 at 1). The second suspect—whom the Government believes and alleges was Turner—wore a mask covering the lower half of his face and a hat, so that only his eyes, ears, and the bridge of his nose were visible. (*Id.*). The second suspect wore a gray Houston Texans baseball hat with a red brim, a black t-shirt, stone-washed jeans, black and brown tennis shoes with gold laces, and brandished a firearm. (Doc. Nos. 16 at 1 & 18 at 2). The suspects were in the store for approximately one

1

minute and fifteen seconds. (Doc. No. 18 at 2). During this time, the men allegedly went behind the store's counter, and the suspect that the Government alleges to be Turner pointed a gun at the store manager and ordered her to open the safe, while the other employees were forced to the ground. (Doc. Nos. 16 at 2 & 18 at 2). The robbers stole nearly $4,000 and a firearm before fleeing the store. (Doc. No. 18 at 2).

The police arrived and they asked the store manager to provide a description of the suspects. (*Id.*). She allegedly told the police that she recognized the "distinctive eyes" of the second suspect because she believed he had previously come into the store to buy an Xbox One several months earlier. (Doc. No. 16 at 3). Cash America's records, however, do not show that Turner has ever been a customer. (Doc. No. 19 at 6). The store manager further described the second suspect as "wearing a black shirt, baseball hat and black mask covering his mouth and nose," being about 30 years old, and older than the other suspect. (Doc. No. 18 at 2).

Approximately ten to fifteen minutes after the robbery occurred, police found Turner hiding in bushes about three miles away from the pawn store. (*Id.*). According to the Government's response, the officers arrived at the location based on "GPS tracker data transmitted from the money stolen from the Cash America Pawn." (*Id.*). The Government alleges that some of the stolen money contained a hidden GPS tracking device, although the police have not reported that they were able to recover any tracking device. (Doc. No. 16 at 2). Additionally, a tow truck driver informed officers that a man was hiding in the bushes. (Doc. No. 18 at 2). Officers reported that at the time Turner was wearing a black t-shirt, stone-washed jeans, and black and brown tennis shoes with gold laces. (*Id.* at 2-3). A Texans baseball hat was located nearby, along with a $100 bill. (*Id.* at 3).

Approximately two and a half hours after the robbery occurred, officers attempted a "show-up" procedure with the store manager. (Doc. No. 18 at 3). A show-up is an identification procedure where the police present a suspect "to an eyewitness [usually] within two hours following the commission of a crime for the purpose of identifying and eliminating suspects." (Doc. No. 16, Ex. 2). In this case, the show-up procedure involved the eyewitness store manager sitting in the back of a patrol vehicle, where she first read admonishments concerning the identification of a suspect, including the statements that: 1) the suspect may or may not be present; and 2) she was not required to identify an individual. (*See* Doc. No. 18, Ex. A.). An officer then drove the store manager slowly past Turner who was in handcuffs, standing outside of another patrol car in front of Cash America, staring down at the ground. (Doc. No. 18 at 3). The eyewitness did not make an identification because she was unable to see Turner's eyes. (*Id.*). Although the officer wanted to attempt a second drive-by so that the store manager "could get another look" at Turner, the eyewitness elected to review a photographic lineup instead because she was nervous. The police then terminated the show-up. (*Id.*). According to the Government's response, in a later interview, the eyewitness also stated that she was too far away from Turner during the procedure to identify him.

The following day, detectives met with the eyewitness to conduct a photographic lineup. (Doc. No. 18 at 3). The Houston Police Department ("HPD") showed the store manager a photo array of six individuals—Turner and five other men with similar physical features. (*Id.*) The photos of the other men were chosen from HPD's booking database. The six photos were randomly arranged by a computer and presented to the store manager to "ensure color variations did not influence" her. (*Id.*). An administrator conducted the lineup procedure to prevent witness coercion. (*Id.*). After reading and signing the same witness identification admonishments as from the show-

3

up procedure, (*see* Doc. No. 18, Ex. 1), and reviewing the photographic lineup, the eyewitness positively identified Turner as one of the robbers. (Doc. No. 18 at 4). One officer wrote that the witness was "100% sure." (Doc. No. 16, Ex. 1). Although Turner makes no actual complaint about the makeup of the photo array, it is this identification that he seeks to suppress based upon the argument that the earlier show-up prejudiced the later photo identification.

## II.     Legal Standard

As stated, before the Court is a motion to suppress an eyewitness's out-of-court identification from being used at trial. The Due Process Clause protects a criminal defendant from the prosecution's use of evidence derived from impermissibly suggestive procedures. *Manson v. Brathwaite*, 432 U.S. 98, 121-22 (1977); *United States v. Sanchez*, 988 F.2d 1384, 1389 (5th Cir. 1993). The inquiry into whether identification evidence "and the fruits therefrom are admissible at trial is a mixed question of law and fact." *United States v. Fletcher*, 121 F.3d 187, 194 (5th Cir. 1997).

The standard for reviewing pretrial identification procedures has developed into a two-part test. *United States v. Gidley*, 527 F.2d 1345, 1350 (5th Cir. 1976). The first step in determining the admissibility of identification evidence is to determine whether the identification procedure was impermissibly suggestive. *Id.* If the identification procedure was not impermissibly suggestive, the inquiry ends there. *Id.* If the court finds the identification was impermissibly suggestive, the second step requires the court to analyze whether the procedure posed a substantial likelihood of irreparable misidentification. *See United States v. Allen*, 497 F.2d 160, 163 (5th Cir. 1974). If both inquiries are answered in the affirmative, then the identification is inadmissible in court. *United States v. Moody*, 564 F.3d 754, 762 (5th Cir. 2009).

Show-up identifications do not necessarily violate a defendant's right to due process, but some procedures can be "so unnecessarily suggestive and conductive to irreparable mistaken identification" that a defendant is denied due process of law. *Neil v. Biggers*, 409 U.S. 188, 196 (1972). In determining whether a show-up identification was impermissibly suggestive, the totality of the circumstances are considered. *Stovall v. Denno*, 388 U.S. 293, 302 (1967). To determine whether an impermissibly suggestive identification procedure gave rise to a substantial likelihood of irreparable misidentification, courts consider five nonexclusive factors: (1) the witness's opportunity to view the suspect at the time of the crime; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description of the suspect; (4) the level of certainty demonstrated by the witness at the confrontation; and (5) the length of time between the crime and the confrontation. *Manson*, 432 U.S. at 114. Against these factors, a court is to weigh the corrupting effect of the suggestive identification itself. *Id.* Thus, even if the identification was impermissibly suggestive, the identification may still be admissible if there is not a substantial likelihood of irreparable misidentification. *Kelley v. Estelle*, 521 F.2d 238, 240 (5th Cir. 1975). Reliability is "the linchpin in determining the admissibility of identification testimony." *Manson*, 432 U.S. at 114.

### III.   Analysis

The question before the Court is whether the attempt to get an identification by the eyewitness using the show-up procedure was so suggestive and conducive to mistaken identification as to make the admission of the later photographic identification impermissible at trial. The court must first decide whether the police used an unnecessarily suggestive identification procedure.

Turner asks this Court to suppress the witness's identification, arguing that "impermissibly suggestive police procedures produced an unreliable eyewitness identification." (Doc. No. 17 at 1). Turner argues that show-ups are inherently suggestive, usually unreliable, and that the officers in this case did not follow the recommended protocols. (Doc. No. 16 at 4, 7). According to Turner, the procedure was impermissibly suggestive because the eyewitness saw Turner standing handcuffed outside of a police vehicle at the crime scene, "which gave the clear impression that officers believed they caught the right man." (*Id.* at 7). Turner argues that this procedure unfairly pointed the witness toward Turner's photo in the photographic lineup the following day because the witness had seen him in handcuffs the previous day. (*Id.*). Therefore, Turner contends, the procedure created a high likelihood of irreparable misidentification as the witness's memory was already tainted. (*Id.* at 9–10).

In response, the Government argues that the identification procedures were not impermissibly suggestive, but that even if they were, the identification is sufficiently reliable. (Doc. No. 18 at 1). The Government contends that the HPD properly conducted the show-up procedure, which resulted in no initial identification because the store manager was nervous and could not see Turner's face from her vantage point in the patrol car. (*Id.*). The Government maintains that the identification of Turner the following day in a photographic lineup should not be suppressed because it stemmed "from authorized police practices, was not improperly suggestive because she did not see the Defendant's face during the show-up procedure, and she positively identified the Defendant pursuant to a valid photographic lineup one day after the robbery." (*Id.*). The Government asserts that the procedure was "clearly not too suggestive because the eyewitness did not identify the Defendant," but instead stated that she was nervous, that she was too far from the Defendant to identify him, and that she could not identify him without seeing

6

his eyes. (Doc. No. 18 at 6). Further, the Government argues that even if the Court were to find the show-up procedure suggestive, the eyewitness's identification was reliable and can be subjected to cross examination. (*Id.*).

Out-of-court identifications volunteered by witnesses are likely to involve suggestive circumstances. *Perry v. New Hampshire*, 565 U.S. 228, 244 (2012); *Simmons v. United States*, 390 U.S. 377, 383-84 (1968). One-on-one confrontations are generally thought to present greater risks of mistaken identification than lineups. *Moore v. Illinois*, 434 U.S. 220, 229 (1977). Nevertheless, their use is necessary in some situations where time is of the essence in catching a suspect and an early identification is aided by the fresh memory of the victim. *Simmons*, 390 U.S. at 384 (noting that cross-examination at trial that exposes to the jury a method's potential for error can substantially lessen the potential danger of misidentification). Accordingly, the Supreme Court has rejected a *per se* approach to whether a show-up procedure automatically violates an accused individual's due process rights. *Neil*, 409 U.S. at 193 (1972).

Although a show-up involves some risk of suggestiveness, that risk, in and of itself, is not enough to render the procedure impermissibly suggestive. It is not suggested that it was illegal or otherwise out of bounds for the police to resort to a show-up procedure in this situation. A serious crime had been committed, and the initial evidence and witness accounts led law enforcement officials to believe that Turner was one of the suspects. The store manager appears to be the primary eyewitness in this case, so her identification was arguably a priority. The justification for this show-up procedure is not as compelling as those circumstances which were found to justify the "one-man lineup" in *Stovall*, 388 U.S. at 294, 302, where the only eyewitness could not go to the police station for the usual lineup because she had been stabbed multiple times and there was "no way of knowing how long she would live." Nevertheless, while no one was on the verge of

death, an immediate recognition could certainly further the goal of solving the crime—especially in light of the eyewitnesses' declaration that she could remember the robber's eyes. *See also Simmons*, 390 U.S. at 384-85 (finding a single photographic identification procedure acceptable and not impermissibly suggestive where valid justification for its use was provided).

The Government cites two cases in support of its argument that the show-up procedure was not impermissibly suggestive. The primary case it cites, *Frank v. Blackburn*, 605 F.2d 910 (5th Cir. 1979), is factually similar to the case at bar. In *Frank*, the defendant was apprehended less than 30 minutes after a robbery that took place seven blocks away. *Id.* at 911. The robber—a black male with a goatee—was wearing a coat, a knit cap, and sunglasses. *Id.* at 911-12. The defendant—a black male with a goatee—had a coat, a knit cap, and sunglasses in his possession when he was arrested. *Id.* at 912. The robber stole a $20 bill, three $5 bills, and some $1 bills; the suspect had a $20 bill, three $5 bills, and nine $1 bills in his possession. While the robber was armed with a gun, no gun was found on the suspect. *Id.* Immediately after his arrest, the suspect was taken to the scene of the robbery and presented to an eyewitness employee who was the victim of the robbery. *Id.* At first, the witness was unable to identify the defendant as the perpetrator of the crime. *Id.* She was then led into another room while the defendant put on the clothing in his possession: the knit cap, coat, and sunglasses, items also worn by the robber. *Id.* On reexamination, the witness identified Frank as the robber, albeit with some hesitation and reservation. *Id.* The Fifth Circuit denied that this one-on-one confrontation was impermissibly suggestive, holding that no evidence was presented to indicate that the police acted improperly in utilizing the identification procedure and that there were no words or actions by police aggravating the suggestiveness of the confrontation. *Id.* at 912-13.

The facts in *Frank*, while somewhat similar regarding the sequence, timing, and circumstances of events, were much more suggestive than the facts here. Both suspects were apprehended nearby after the robbery, having the same or similar clothing as the robber, and both were brought back to the scene of the robbery for a show-up. Like the eyewitness in *Frank*, the eyewitness in this case was unable to identify the suspect as the robber in the first presentation due to her vantage point, but did so successfully in the second presentation. Unlike *Frank* where the officers had the suspect put on additional clothing that he had allegedly been wearing during the robbery, there is no evidence in this case that the officers said or did anything to influence the witness's second identification attempt.

Turner argues in his reply that the show-up here does not fit the facts in the cases the Government cites. Turner also argues that the government's analysis "misses a crucial piece of the puzzle: the show-up was not the only part of the identification procedure." (Doc. No. 19 at 2). Turner argues that the photo array was a continuation of the alleged impermissible "show-up." (In fact, it is the crucial part of the process since the show-up did not result in an identification.). The Court appreciates the distinction between the facts here and the facts in the reported cases, but it does not draw the same conclusion as Turner. The circumstances surrounding the show-up could have resulted in a suggestive procedure, but either because of the distance, the witness's distress, or the fact that the witness could not see the defendant's eyes, it did not. He was not identified—consequently, the procedure could not have been overly suggestive.

While not automatically resolving the issue concerning whether the show-up undermined the later photo array identification, that fact certainly contributes to that answer. While Turner does suggest a causative link between the unsuccessful show-up and the later "successful" photo

9

identification, he does not factually support this claim. Moreover, he has made no specific complaint about the manner in which the photo array was handled.

Therefore, the Court rejects these arguments. *Frank*, whose facts are much more suggestive of influence, compels a denial of the motion in this case. *See*, 605 F.2d at 911–13. *Frank* involved the witness seeing the suspect at the show-up more than once and not identifying him until the second appearance when he was wearing the clothing that the robber wore. *Id.* at 912. Moreover, in *Frank* the witness had an unencumbered view of the suspect, while here the witness could not see Turner's eyes either because of the distance, the fact he faced downward, or both and was not identified until the witness saw a picture of his full face in a neutral photo lineup. *See id.* Therefore, Turner's argument that the Government "ignores a crucial second aspect of the police procedures in this case—the officers did not stop at a show-up" is unconvincing.

Turner also contends that the Government makes no effort to distinguish *Foster v. California*, 394 U.S. 440 (1969), which allegedly involves more analogous facts. (Doc. No. 19 at 2). The Court finds that this assertion lacks merit because the facts of *Foster* are distinct from the case at bar. *Foster* involved a lineup—not a show-up—where the defendant was clearly identifiable from the other men because of the significant difference in the suspect's height and the fact that the defendant was wearing a leather jacket that the robber had worn. *Id.* at 442-43. When the lineup failed to lead to a positive identification, the police arranged a one-to-one confrontation between the defendant and the witness, and still the witness hesitated to identify the defendant. *Id.* at 443. A few days later, another lineup was arranged at which the defendant was the only person in the lineup who had also participated in the first lineup, and a positive identification was finally given. *Id.* The *Foster* court found that "this case presents a compelling example of unfair lineup procedures." *Id.* at 442. *Foster* is unlike the facts of this case because in

*Foster*: (1) there were three appearances; (2) it was a different identification procedure; and (3) the court ruled that it was impermissibly suggestive because of the distinguishing characteristics of the defendant compared to the others in the lineup. One could argue, like Turner here, that between the show-up and the photo array, his was the only face that appeared twice. In this case, police included five other photos from their database of men who had similar characteristics to Turner and no variation in clothing that would be unduly suggestive to the eyewitness. The Court finds the initial show-up not to be impermissibly suggestive.

The show-up identification procedure employed in front of the Cash America shop could have been, but was not impermissibly suggestive to the eyewitness. Nevertheless, even if the show-up were found to be improperly suggestive, there are no facts to suggest that the identification procedure used resulted in a substantial likelihood of misidentification. *See Biggers*, 409 U.S. at 200 (even if unduly suggestive, the victim's good record for reliability led the court to find no substantial likelihood of misidentification); *United States v. Merkt*, 794 F.2d 950, 957 (5th Cir. 1986) (female photo array was unduly suggestive, but the witness's identification of the defendant was sufficiently reliable to outweigh the corruptive effect of the array). In answering the second inquiry of whether the procedure posed a substantial likelihood of irreparable misidentification, the court considers five nonexclusive factors: (1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness's degree of attention; (3) the accuracy of his prior description of the criminal; (4) the level of certainty demonstrated at the confrontation; and (5) the time between the crime and the confrontation. These factors are to be weighed against "the corrupting effect of the suggestive identification itself." *Manson*, 432 U.S. at 99. Importantly, courts evaluate only the chosen identification method itself, irrespective of whether different, more

desirable methods of identification were available. *United States v. Sutherland*, 428 F.2d 1152, 1156 (5th Cir. 1970).

Considering the totality of the circumstances and applying these factors to the facts of this case, the Court finds that the identification was reliable, even if the show-up confrontation had the potential to be suggestive. First, the witness in this case had a clear, albeit brief, chance to view a portion of the suspect's face during the time the robber was allegedly in the pawn store. Given that the store manager particularly recalled the suspect's "distinctive eyes," it follows that she must have had ample opportunity to view the suspect face-to-face while he was in the pawn store. Additionally, the robbery took place in the middle of the day in a well-lit store. Second, the witness was not a casual or passing observer—she was the only employee in the store who was not forced to the ground and was dealing directly with the two robbers. She was paying enough attention to immediately provide a relatively detailed description of the suspect, including his approximate age, the clothes he was wearing, and a distinctive feature of the portion of his face she was able to see. Third, the description of the suspect provided by the witness proved accurate. The description was reported within minutes of the encounter, and the suspect matched the store manager's description. Moreover, the following day, the witness viewed Turner's photo in a photographic lineup. Once she could see his eyes, she identified him as the suspect she had previously described. Fourth, she exhibited a high level of certainty in identifying the suspect in the photographic lineup, once she was able to see his eyes, reportedly stating she was "100% sure it was him." (Doc. No. 16, Ex. 1). Finally, the witness's description of the suspect was given to police within minutes of the crime and she positively identified Turner in a photographic lineup the following day. These fact clearly satisfy the *Manson* factors.

In *Biggers*, the Supreme Court held that law enforcement's use of an unnecessarily suggestive show-up procedure did not necessitate suppression of the victim's identification of the suspect. 409 U.S. at 199-200. Despite the improper procedure, the victim's identification was reliable because she saw the suspect for a considerable period of time under adequate light, provided police with a detailed and accurate description of her attacker prior to the show-up, and had "no doubt" that the defendant was the person she had seen. *Id.* at 200. Similarly, here, even if one assumes the show-up to be unnecessarily suggestive, the store manager's identification was reliable because she had a solid opportunity to view the suspect in adequate light, provided an accurate description of the suspect in considerable detail, and was "100% sure that [Turner] is the guy who had the gun and robbed them." (Doc. No. 16, Ex. 1). Thus, the factors weigh largely in favor of the reliability of the identification.

These indicators of the witness's ability to make an accurate identification are sufficiently reliable to outweigh the corruptive effect of the initial show-up procedure. Although the practice of showing suspects singly for purposes of identification may, and perhaps should, be viewed generally with suspicion, *see Simmons*, 390 U.S. at 383, the Court finds in the present case no factual support for the claim that the show-up procedure somehow tainted the later photo identification. The police did not pressure the witness to make an identification during the show-up procedure, they properly provided her the admonishments, and terminated the procedure as soon as the witness voiced her desire to conduct the identification by alternative means. The detectives conducted the lineup using a third party administrator to avoid witness coercion. (Doc. No. 18 at 3). The identification was made in circumstances allowing for the witness to reflect without external pressure or fear. Finally, and perhaps most importantly, is the conduct of the witness herself. All facts point to the fact that she acted responsibly and in a bias-free manner. She

told police before the show-up that she could identify the eyes. At the show-up, when she could not view the suspect's face, she refused to identify him. She only identified him when she picked him out of the photo lineup when she had the chance to view the eyes of the six suspects in the array. Finally, the claim that the show-up, where the witness could not view the suspect's eyes, tainted the second photo procedure, where she could, is at best speculation and is unsupported by evidence.

### IV.  Conclusion

Based on the foregoing, Defendant's Motion to Suppress (Doc. No. 16) is hereby denied.

SIGNED at Houston, Texas this 28th day of August, 2020.

Andrew S. Hanen
United States District Judge